**HARTFORD–EMPIRE CO. v. HAZEL–ATLAS GLASS CO.**

**HARTFORD–EMPIRE CO. v. SHAWKEE MFG. CO. et al.**

Nos. 4414, 5203.

Circuit Court of Appeals, Third Circuit.

June 30, 1943.

See, also, 125 F.2d 976.

Stephen H. Philbin, of New York City (Maxwell Barus, of New York City, on the brief) for Hazel-Atlas.

Wm. B. Jaspert, of Pittsburgh, Pa., for Shawkee Mfg. Co. et al.

Francis W. Cole, of Hartford, Conn. (Stebbins & Blenko, of Pittsburgh, Pa., Thomas G. Haight, of Jersey City, N. J., and Edgar J. Goodrich, of Washington, D. C., James M. Carlisle, of Hartford, Conn., Robson D. Brown, of Hartford, Conn., on the brief), for Hartford-Empire Co.

Thurman Arnold, Asst. Atty. Gen., and Hugh B. Cox, Samuel S. Isseks, and Lawrence S. Apsey, Sp. Assts. to the Atty. Gen., for the United States, amicus curiae.

Before BIGGS, MARIS, CLARK, and JONES, Circuit Judges.

JONES, Circuit Judge.

Hazel-Atlas Glass Company and Shawkee Manufacturing Company, defendants respectively in the above-entitled suits, each filed a petition in this court for leave to file a bill of review in the District Court in respect of the final decrees severally entered therein. The petitions alleged in substantial part that a fraud had been practiced upon this court in connection with the appeal in the Hazel-Atlas case and that it had induced this court's order (59 F.2d 399, 413) reversing the decree of the District Court in that case (39 F.2d 111, 120). The decision in the Hazel-Atlas case in turn compelled the decree of the District Court in Hartford-Empire's favor in its suit against Shawkee and others which on appeal was affirmed by this court. See Shawkee Mfg. Co. et al. v. Hartford-Empire Co., 3 Cir., 68 F.2d 726.

As the petitions relied solely upon the fraud allegedly practiced upon this court and set forth nothing appropriate for the District Court's inquiry upon bills of review in respect of the subject-matter of the suits in that court, leave to file the bills below was accordingly denied. However, adopting by analogy the procedure followed in the cases of Art Metal Works v. Abraham & Straus, Inc., 2 Cir., 107 F.2d 940, and Id., 2 Cir., 107 F.2d 944, certiorari denied 308 U.S. 621, 60 S.Ct. 293, 84 L.Ed. 518, we granted leave to the petitioners to amend the prayers of their respective petitions so as to seek relief from this court, on the ground of the alleged fraud, against the orders heretofore entered in the above appeals. See 3 Cir., 125 F.2d 976, 977. The petitions were amended accordingly and, as so amended, are now before us.

In 1928 the Hartford-Empire Company sued the Hazel-Atlas Glass Company in the District Court for the Western District of Pennsylvania for the alleged infringement by Hazel-Atlas of Hartford-Empire's patent (No. 1,665,391), known as the Peiler patent. The District Court, deeming the patent to be at best but a slight improvement in a well developed art (automatic feeders for mechanical glass bottle blowing), held that the claims were not entitled to a broad construction and that, with the Peiler patent so construed, Hazel-Atlas had not infringed. 39 F.2d 111. On appeal this court (one judge dissenting) considered Peiler a pioneer in what was thought to be a meagre art in the glass-blowing industry and that the claims of the patent were therefore entitled to a broad construction. So construed, the validity of the patent was sustained and Hazel-Atlas was held to have infringed the forty-four claims (out of the sixty of the patent in suit) upon which the plaintiff relied. The decree of the District Court was accordingly reversed (59 F.2d 399, 413) and the record remanded "with instructions to enter a decree holding the plaintiff's patent valid and the claims sued on infringed, and directing an accounting."

The opinion for the majority in support of the order thus entered by this court made frequent references to and quoted extensively from an article in a trade journal known as the National Glass Budget. The article purported to be the work of one William P. Clarke, who had signed it as author, and was titled,—"Introduction of Automatic Glass Machinery; How Received by Organized Labor—By William P. Clarke, President, American Flint Glass Workers Union." After alluding to the historic opposition of glass workers to mechanical glass-blowing appliances, the so-called Clarke article went on to show that, prior to gob-feeders, the only successful automatic feeder for a glass-blowing machine had been that covered by the Owens patent, which, like another patent (Brooke), operated on the principle of stream feed into a mold (the former by suction and the latter by flow) of molten glass of high temperature and low viscosity, unlike the automatic plunger gob-feeder (Peiler's patent). Appended to the article was a chart purporting to show the ascending curve of the increased glass bottle pro-

duction from the use of gob-feeders from 1917 onward, and the almost concomitant flattening of the production curve of manufacture under the Owens patent which, up to that time, had increased both continuously and regularly. The Clarke article, which had not been introduced in evidence in Hartford's suit against Hazel-Atlas, got into the record merely as a part of the voluminous file-wrapper history of the Peiler patent in its long and precarious course in the Patent Office. Neither had it been used nor adverted to at trial; nor was it referred to in the briefs below nor in the exhaustive opinion of the trial judge.

The fact is that the article had not been written by Clarke, but by one R. F. Hatch, an attorney in the patent department of Hartford, which by that time had become the assignee of the Peiler patent application. Hatch not only prepared the article and its accompanying chart but he also procured Clarke's signature thereto as the author, and caused it to be published in the National Glass Budget with the understanding, assented to by the publisher, that Hartford should not be connected with it. The article appeared in the July 17, 1926 issue of the National Glass Budget. R. D. Brown, Vice-President and Patent Counsel of Hartford, and V. M. Dorsey, a patent attorney for Hartford, brought the published article to the attention of the Patent Office on October 12, 1926, with special reference to the Peiler application (Serial No. 294,792), whereon the patent (No. 1,665,391) issued on January 3, 1928.

It is unnecessary for present purposes to relate in detail how Hatch, aided and abetted by Brown and Dorsey as well as by H. W. Carter, of Owens Bottle Company,[1] deliberately set about "to get the production curve and a few statements in regard to gob feeding into print" (from a source ostensibly hostile to labor-saving glass-blowing machinery) for use in the Patent Office in connection with the Peiler application which had already been rejected on the ground that its claims were not patentable. As the matter then stood, the Peiler application was confronted with apparently insurmountable Patent Office opposition. That Hatch, Hartford's employee, and not Clarke, the labor leader, wrote the article

and that the purpose of the methods employed in having it published was as above indicated may now be taken as indisputably established. But, sordid as is the story concerning the genesis of the Clarke article and the deceptive design and use of its spurious authorship, still it does not qualify as after-discovered evidence in either the Hazel-Atlas or the Shawkee suit.

Counsel for Hazel-Atlas were aware at least by the time of the trial of their case in April 1929 that Hatch was the author of the Clarke article. Although then so informed, counsel for Hazel-Atlas deliberately chose not to go into the matter of the article's real authorship, fearing that if they should refer to the article (which was not in evidence), they might thereby call attention to the statements therein contained as to the increased production from gob feeders as compared with stream feeders, which could not be successfully refuted. (See affidavit of Edmund P. Wood, Esq., of Cincinnati, whom both sides accredit.) There is no need to burden this opinion with a detailed recital of how Mr. Wood and his father and former senior partner, William R. Wood, Esq., came by their information. They were counsel for the Nivison-Weiskopf Company which was also sued by Hartford for alleged patent infringement. Hartford-Empire Co. v. Nivison-Weiskopf Co., 6 Cir., 58 F.2d 701. That suit came on for trial in the District Court for the Southern District of Ohio shortly after the trial of the Hazel-Atlas case in Pittsburgh, which the Messrs. Wood had alternately attended from time to time. Suffice it to say that Clarke had told William R. Wood in September 1926 that he had not written the article but that Hatch had; and Hatch had freely admitted to Edmund P. Wood in February 1928 that he had written the article. It was this information which the Messrs. Wood imparted to counsel for Hazel-Atlas at the time of the trial of Hartford's suit against Hazel-Atlas in April, 1929.

In their brief on appeal to this court in the Hazel-Atlas case, counsel for Hartford, the appellant, cited and made reference to the Clarke article and its appended chart, which they reproduced in their brief, in support of the assertion that "It [the Peiler plunger feeder] Broke the Owens Domina-

---

[1] Owens Bottle Company (later Owens-Illinois Glass Company), having made its peace with Hartford by a cross-licensing settlement agreement on April 9, 1924, was thenceforth interested in sustaining Hartford's patents and applications therefor.

tion". The only response made to this by counsel for Hazel-Atlas in their brief for the appellee was that the chart was misleading because "the curve for 'gob feeders' starts with the year 1917" whereas Hartford's "paddle feeder [which it asserts was a gob feeder] went into commercial use in 1915"; that whatever portion of the gob-feeder production shown by the chart up to 1922 was made by plunger feeders "was made on plunger feeders developed by others, for plaintiff's [Hartford's] first plunger feeder was November, 1922"; and, finally, that the chart "is not competent evidence against the defendant, being merely part of ex parte statements made in plaintiff's [Hartford's] behalf during the Patent Office proceedings." Nowhere did the brief of counsel for Hazel-Atlas suggest what they then knew, viz., that Hatch had written the Clarke article.

When the importance which the majority of this court attached to the merit of the Clarke article was revealed by the opinion filed on May 5, 1932, in the Hazel-Atlas case, counsel for Hazel-Atlas shortly thereafter obtained affidavits from the Messrs. Wood definitely attributing authorship of the Clarke article to Hatch on the say-so of both Clarke and Hatch. They also caused Clarke to be interviewed by an investigator. While Clarke lamely reaffirmed that he had written the article, a reading of the investigator's report serves to indicate that Clarke's renewed claim to authorship, in its cautiously phrased assertions, was lacking in truth. Yet, within approximately ten days after the investigation had been begun it was abandoned without any attempt to interview Hatch who, according to William R. Wood's accredited affidavit, "had no hesitation in admitting the circumstances" concerning the authorship of the Clarke article as Wood had related them. Nor were the affidavits of the Messrs. Wood, which are now urged upon us, brought to the attention of the court which had just lately heard and disposed of the appeal in the Hazel-Atlas case. In short, Hazel-Atlas made no timely representations to this court concerning the Clarke article. Furthermore, and notwithstanding that Judge Woolley had entered a strong dissent, no petition for rehearing was filed even to the extent of suggesting that the majority of the court had erroneously considered and reasoned from matter which undeniably was not evidence in the case. The failure to file a petition for rehearing was especially notable. Upon stipulation of the parties, the court on five separate occasions had granted an extension of the time for the filing of a petition for rehearing, the last of these extensions expiring on July 29, 1932. Nor was certiorari asked for. The reason for Hazel-Atlas' uncomplaining and inactive course in the circumstances shown is not far to seek. On July 21, 1932 (as of July 1, 1932) Hazel-Atlas entered into a settlement and cross-licensing agreement with Hartford.

In view of the foregoing, it is hardly accurate to suggest, if that be the suggestion, that Hazel-Atlas did not know until the disclosures in 1941 in the anti-trust suit of the United States against Hartford-Empire Company and eleven other corporate defendants including Hazel-Atlas in the United States District Court for the Northern District of Ohio that it was Hatch and not Clarke who had written the Clarke article.[2] And the same can be said for Shawkee, the only difference being that Shawkee brought to the attention of the court forthwith, at the time of its pending appeal, its lately acquired information concerning the Clarke article, in the manner and with the result as will now appear.

Hartford's suit against Shawkee and several other defendants for alleged infringement of the Peiler patent was instituted in the District Court for the Western District of Pennsylvania on May 31, 1933. The matter was brought before the court promptly on the plaintiff's motion for a preliminary injunction and the defendants' motion in opposition thereto, together with supporting affidavits for the respective parties. On June 27, 1933, the District Court filed an opinion and decree awarding the plaintiff a preliminary injunction from which the defendants immediately appealed. The appeal was argued on October 3, 1933, before this court, composed of the same

[2] Hazel-Atlas' first petition to this court in respect of the background of the Clarke article was filed November 19, 1941, following by six months an order entered, over the objections of both Hartford and Hazel-Atlas, by the District Court in Ohio in the anti-trust suit on May 9, 1941, impounding in the hands of the clerk of that court all moneys due Hartford and Hazel-Atlas by one to the other under their cross-licensing agreement of July 21, 1932, effective as of July 1, 1932. That petition was denied as stated at the outset of this opinion.

judges who had sat for the argument and disposition of Hartford's appeal in the Hazel-Atlas case.

On October 30, 1933, while the appeal in the Shawkee case was under advisement, Otto R. Barnett, Esq., of counsel for Shawkee, with notice to Thomas G. Haight, Esq., of counsel for Hartford, wrote to Judge Buffington submitting therewith certain copies of papers said to show that " * * * the Clarke article was printed at the instigation of the Hartford-Empire Company, through one of its attorneys, R. F. Hatch * * *." In his letter to Judge Buffington, Mr. Barnett called attention to the weight given by this court in its decision in the Hazel-Atlas case " * * * to certain publications, including a published article *purported* to have been written by William P. Clarke, president of the American Flint Glass Workers Union, paying tribute to the Peiler invention." (Emphasis supplied.) On November 3, 1933, Mr. Haight replied to Mr. Barnett's letter by letter also addressed to Judge Buffington, whereof a copy was sent to Mr. Barnett. That the information respecting the Clarke article, thus imparted to Judge Buffington, came to the attention of the full court is evident from Mr. Haight's letter wherein he states that "Three copies of this letter, in accordance with the suggestion which you made in open Court yesterday, are enclosed herewith." The court on November 2, 1933 (the "yesterday" just referred to) was composed of the same three judges who had heard both the Hazel-Atlas and the Shawkee cases. And Mr. Barnett, in expressed compliance with the suggestion of the court, as disclosed by Mr Haight's letter, sent Judge Buffington on November 6, 1933, two additional copies of his communication of October 30, 1933. Thereafter Mr. Barnett addressed several more letters to Judge Buffington relative to the matter of the Clarke article, stating in his letter of December 16, 1933, that the correspondence submitted " * * * clearly shows that the publication of this [Clarke] article in the Glass Budget was instigated by the ingenious brain of Mr. Hatch, one of the plaintiff's [Hartford's] attorneys * * *."

Subsequently, viz., on January 11, 1934, this court handed down its decision affirming the decree in the Shawkee case. Shawkee petitioned for a rehearing, which was denied on February 21, 1934. Certiorari was thereafter asked for and denied, 292 U.S. 640, 54 S.Ct. 773, 78 L.Ed. 1492, as was also a subsequent petition for certiorari, 293 U.S. 600, 55 S.Ct. 117, 79 L.Ed. 693. In its petition to this court for a rehearing, Shawkee had again set forth " * * * that the [Clarke] article was a publication instigated by the plaintiff [Hartford] and published at the plaintiff's urgent request * * *." There can be no doubt that the matter received the attention of all of the members of the court which had heard the Shawkee, as well as the Hazel-Atlas case. So much for Shawkee's knowledge respecting the Clarke article as long ago as 1933, while the original appeal in the Shawkee case was still pending in this court. In 1935 Shawkee sought this court's leave to file a bill in the nature of a bill of review, which was refused, and again in 1938 sought this court's leave to file a petition for rehearing, which was likewise refused. Not possibly can the information as to the facts attending the publication of the Clarke article be deemed to rate as after-discovered evidence so far as either Hazel-Atlas or Shawkee is concerned.

 In considering whether the spurious authorship of the Clarke article was material to this court's decision in the Hazel-Atlas case it is necessary for us to free our minds completely of any views we may independently have that the claims of the Peiler patent fail to disclose patentable invention. We are neither called upon nor would it be appropriate for us to presume to alter or amend a former decision of this court for supposed error therein on the comparative basis of our possibly differing views with respect to either the merits or the law applicable thereto. Incidentally, the one serious charge which the petitioners have made concerning the Clarke article goes to the deception practiced respecting its authorship. No substantial complaint has yet been made that what the article contained in material part, namely, the ascendency of gob-feeders over stream feeders, was factually false. In fact, counsel for Hazel-Atlas recognized in April 1929 that the only statements in the Clarke article of any possible pertinence were the assertions that Hartford's feeders had gone into widespread commercial use and had been commercially successful, which was freely admitted by everyone concerned with a Hartford suit as being incontrovertible. (See affidavit of Edmund P. Wood, Esq.) To be material, the fraud, whereby a decree was allegedly obtained, must have prevented the party complaining from making a full and fair defense. Toledo Scale Co.

v. Computing Scale Co., 261 U.S. 399, 421, 43 S.Ct. 458, 67 L.Ed. 719.

■ But, wholly apart from the Clarke article, the majority of the court in the Hazel-Atlas case, upon turning to "the proofs", drew their own conclusions in support of the action which the court thereupon took. That such was the primary basis of the majority opinion in the Hazel-Atlas case is confirmed by the opinion for the court in the Shawkee case where, without mention of or reference to the Clarke article, this court again held the Peiler patent valid. True enough, in the Shawkee case the court referred to what it had held in the Hazel-Atlas case with respect to the validity of the Peiler patent. But that only served to confirm that what was held in the Hazel-Atlas case was the court's independent judgment, regardless of the Clarke article. That this is so is further confirmed by the fact that Judge Woolley, who had dissented sharply in the Hazel-Atlas case, separately concurred in the court's order in the Shawkee case stating that he regarded himself as bound by the court's decision in the Hazel-Atlas case. And that was after the matter of the Clarke article had been brought to the court's attention by the Barnett correspondence while the Shawkee appeal, which had been lately argued, was still under advisement.

In the situation shown, it is not possible for us to say that the Clarke article was so basic to this court's decision in the Hazel-Atlas case that, upon the showing of fraud in the article's authorship, we would be justified in setting aside the orders in the Hazel-Atlas and Shawkee cases entered by a duly constituted court having jurisdiction to hear and dispose of the appeals in those cases. In no event is the end which was thus made of that litigation to be avoided casually. Cf. Toledo Scale Co. v. Computing Scale Co., supra, which quotes at page 425 of 261 U.S., at page 465 of 43 S.Ct., 67 L.Ed. 719, from Justice Story's apt statement in Ocean Insurance Co. v. Fields, 18 Fed.Cas. page 532, No. 10,406, as to the need for putting an end to litigation.

■ So far we have considered this matter on the merit of the petitioners' allegations and their standing to seek the relief for which they petition; and we conclude against them on both grounds. But, even had our conclusions in such regard been otherwise, we would still find ourselves confronted with a lack of power to vacate or set aside the decrees of the District Court, which reside therein unaffected by any retention of jurisdiction in this court.

Following the disposition of the appeals in the Hazel-Atlas and Shawkee cases whereby this court acquired the only jurisdiction it ever had over the decrees in those cases, appropriate mandates duly issued and the terms at which the final orders on the appeals were entered expired long prior to the filing of the instant petitions without action having been taken to extend this court's grasp. In that situation there is nothing from which the jurisdiction of this court can be deemed to have been continued. This rule applies with full vigor to a Circuit Court of Appeals. See Nachod et al. v. Engineering & Research Corporation, 2 Cir., 108 F.2d 594, where the Court of Appeals said,—"Our term having expired since the mandate went down, we have no power to recall it" (citing cases). And without a recall of the mandate we are powerless to control or affect the decrees in the District Court which the petitioners now ask us to vacate and set aside.

The procedure followed in the Art Metal cases, cited supra, does not derogate from this rule. There the vote of a judge of the Court of Appeals who had been corrupted in respect of that litigation was necessary to produce one of the two decisions in the appellate court between the same parties and involving the same patent, so that no qualified court had really disposed of those appeals; and, by the same token, no competent mandates ever issued, hence, the term time was irrelevant. The appeals were treated in effect as never having been coram judice theretofore. The orders thereupon entered in order to clear the record in the Art Metal cases of the former invalid action taken therein cannot properly be utilized to spell out power in a Circuit Court of Appeals to recall its mandate after the expiration of the term when no action has been taken within the term to continue the jurisdiction of the court. The view we thus take of the procedure followed in the Art Metal cases is confirmed by the fact that after the action taken therein looking to a de novo argument of those appeals, the same court, composed of the same judges who had sat for the reargument of the Art Metals appeals and had disposed of them on November 20, 1939, reasserted just one month later (December 22, 1939) in

the Nachod case, supra, the lack of power in a Court of Appeals to recall its mandate after the term has expired.

■ And, without a recall of the mandates, where would we arrive even though we should conclude that the fraud in connection with the Clarke article was fundamental to this court's decisions in the Hazel-Atlas and Shawkee cases and should attempt to act upon that conclusion? Suppose we should vacate this court's extant orders in those cases, restore the appeals to our docket and, after reargument, conclude that the Peiler patent is invalid and thereupon enter orders to that effect. By what right or authority could we impose such orders upon the District Court? Could we require that court to set aside its final decrees heretofore duly entered pursuant to valid and still subsisting mandates of this court and to substitute therefor other decrees in compliance with our later orders? We think not. We are without power to affect a final decree of a District Court except in the exercise of our appellate jurisdiction and, once our mandate, based upon an order of a competently constituted court, goes down, our control over the decree below entered pursuant to the mandate comes to an end unless the mandate be recalled or action otherwise be taken within term time to extend our jurisdiction.

■ If either Hazel-Atlas or Shawkee feels itself aggrieved by reason of fraud attaching to the procurement of the Peiler patent, the course is open to them to file original bills to impeach the decrees, now standing against them in the District Court, on the ground of the alleged fraud in the issuance of the patent whereof the decrees are predicated. Dowagiac Mfg. Co. v. McSherry Mfg. Co., 6 Cir., 155 F. 524, 527-528; Cyclopedia of Federal Procedure, Vol. 4, § 1159, pp. 342-345. It is in such an instance, i.e., where the question of alleged fraud in the procurement of a decree is placed squarely before a court having jurisdiction to hear and dispose of the matter, that the rule of United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93, and Marshall v. Holmes, 141 U.S. 589, 12 S.Ct. 62, 35 L.Ed. 870, as to whether the alleged fraud is extrinsic or intrinsic, becomes germane.

■ Nor is the United States, which has filed a brief herein as amicus curiae, helpless to annul a patent that has been fraudulently obtained. United States v. American Bell Telephone Company, 128 U.S. 315, 370, 9 S.Ct. 90, 32 L.Ed. 450. But its recourse in such regard is by direct action to that end. In this instance, however, the Government, as its brief expressly states, "is not at present seeking to intervene in the instant suits, nor is it now taking steps to have the patent here involved annulled."

The petitions to vacate and set aside the decrees in the above-entitled cases must be dismissed.

Judge CLARK did not participate in the consideration of these petitions.

BIGGS, Circuit Judge (dissenting).

I do not believe that this court lacks the power to remedy an apparent fraud perpetrated on it eleven years ago. On December 29, 1941, we filed a per curiam opinion in the instant cases, 125 F.2d 976, 977, declaring that this court would " * * * pass upon the question of whether the mandates of this court should be recalled and the cases reopened * * *", rather than grant the prayers of the original petitions which were for leave to file bills of review in the district court.

The petitions in their present form are in substance bills for relief against decrees on the ground of fraud. As was stated in Taylor v. Easton, 8 Cir., 180 F. 363, 368, the time within which such bills must be filed is governed by the general equitable rule of laches and is not limited by the end of the term at which the decrees were entered. Technicalities of form have not been insisted upon in respect to such bills, and a bill not sustainable as a bill of review, may be treated as a bill to set aside a decree for fraud if it contains the necessary allegations. Cyclopedia of Federal Procedure, Vol. IV, p. 347, citing Dunlevy v. Dunlevy, C.C., 38 F. 459. Concededly, with the exception of the two decisions by the Circuit Court of Appeals for the Second Circuit, which are discussed more at length hereafter, I can find no authority for the proposition that bills or petitions seeking the relief sought here may be filed to a circuit court of appeals, but under the peculiar circumstances of this case (particularly in view of the fact that this is the court upon which the fraud was perpetrated), I can perceive no valid reason why, despite the end of the terms, we should not act to preserve our appellate jurisdiction. The word "bill" of course connotes an original action precisely as the

word "petition" connotes an action ancillary to a proceeding already pending but this distinction, which is at best a technical one, affords little support for the position of the respondent in the cases at bar.

The majority opinion is based upon two grounds. The first is an alleged lack of power in this court to set aside the decrees of this court after the end of the terms at which our mandates were dispatched. The second ground is the belief that the fraud worked upon this court did not effect the entry of the decrees complained of. I think that we do possess the power to set aside the two decrees in question if the evidence warrants. I think also that the fraud which was apparently practiced upon this tribunal did serve to effect the decisions of this court. Whether we should act upon the petitions depends, in my opinion, on whether the facts alleged in them tend to show sufficiently the nature and extent of the fraud that was perpetrated upon this court and whether the petitioners were diligent in presenting the facts relating to the fraud to this court as soon as those facts became pertinent.

As to our jurisdiction to receive these petitions and to pass upon the matters raised by them, I am not unmindful of the fact, as I have indicated, that such bills or petitions are ordinarily presented to the court below upon grant of leave to do so by the appellate tribunal, but the apparent facts in the cases at bar bear an analogy to the circumstances which were before the Circuit Court of Appeals for the Second Circuit in Art Metal Works v. Abraham & Straus, 107 F.2d 940, and Id., 107 F.2d 944, certiorari denied 308 U.S. 621, 60 S.Ct. 293, 84 L.Ed. 518.

The pertinent facts in the Art Metal Works cases are as follows. One of the members of that court had been corrupted. The tribunal thereupon reconstituted itself, and after applications similar in form to those before us had been filed with it, itself reheard the cases. The fraud was practiced upon the circuit court of appeals and therefore that court heard the matters raised by the petitions and disposed of them. The court acted to protect the integrity of its appellate jurisdiction. The majority of this court take the position that by reason of the corruption of one of the judges of the Circuit Court of Appeals for the Second Circuit that tribunal never decided the appeals before it and the appeals were coram non judice and that therefore the jurisdiction of the circuit court of appeals could not have come to an end despite the fact that five years and as many terms had elapsed since the original decrees had been filed and the mandates dispatched. There is no indication, however, in the opinions of the court that jurisdiction was predicated upon any such theory. The question of jurisdiction after the end of the term was not even discussed. Though there is a great distinction between a corrupt judge and one who may be disqualified in a case because he has a pecuniary interest, a legal analogy is presented by the two situations. It is the law that judgments rendered by a pecuniarily interested judge are not void but are merely voidable. Utz & Dunn Co. v. Regulator Co., 8 Cir., 213 F. 315; Owens v. Dancy, 8 Cir., 36 F.2d 882; In re Fox West Coast Theaters, D. C., 25 F.Supp. 250; Crites v. Radtke, D. C., 29 F.Supp. 970. In my opinion the decrees in the Art Metal Works cases were valid until the circuit court of appeals itself set them aside. Certainly the mandates were honored in the court to which they were dispatched. I think that it is more probable that the circuit court of appeals treated the petitions in the Art Metal Works cases as if they were bills to relieve from decrees on the ground of fraud and granted relief and rehearings because that fraud was glaringly apparent. The difference between the Art Metal Works cases and those at bar seems to me to be only one of degree. In the former cases a litigant had corrupted the court. In the cases at bar, if the allegations of the petitions and the supporting affidavits are correct, a litigant has corrupted the record by knowingly inserting fraudulent matter therein and calling the corrupt matter to the attention of this tribunal. In neither the Art Metal Works cases nor in the cases at bar was the fraud perpetrated upon the lower courts. The significant fact is that the fraud was worked upon the appellate tribunals.

In No. 4414 the fraud was perpetrated upon this court. That fraud was perpetuated in No. 5203 because the court followed the ruling established in No. 4414. In the case at our No. 4414, the Clarke article was not referred to in the briefs of counsel in the court below and it was not mentioned in the opinion of the trial judge. It came into the record as a part of the file wrapper history of the Peiler patent and

it had been fabricated for the purpose of deluding the Patent Office.[1] The fraud had no effect upon the district court which gave the Peiler claims in issue a narrow construction. The Clarke article, under the title "Introduction of Automatic Glass Working Machinery; How Received by Organized Labor", was served up to this court upon Hartford-Empire's brief and a majority of this court did eat thereof. The fraud, therefore, was upon this court and affected its appellate jurisdiction. In view of these facts should we not ourselves dispose of the matters raised by the petitions? We have at our disposal every writ necessary to protect and maintain our jurisdiction. See Section 262 of the Judicial Code, 28 U.S.C.A. § 377.

The majority's answer to this argument is that at the end of each term our jurisdiction over appeals in which valid mandates have gone down at that term is at an end; that otherwise there would never be an end to litigation; and that by filing an original bill in the district court that court might set aside or enjoin the enforcement of its decrees entered in these causes upon our respective mandates. Precisely the same arguments could have been made to the Circuit Court of Appeals for the Second Circuit in the Art Metal Works cases but that court did not proceed upon such a theory. The fraud on this court cannot be relieved by way of proceedings on bills for review or original bills filed in the district court.

The fraudulent matter, the Clarke article, was offered in the court below for no other purpose than to prove what had taken place in the Patent Office in respect to Peiler's application. The court below was not in error in admitting it for such a purpose. It did not use the Clarke article as proof that Peiler had made a basic contribution to the art of glass bottle blowing. Quite erroneously, as a matter of law, this court did make use of it for that very purpose. What then would be before the court below on bills for review or original bills to set aside the decree entered in the lower tribunal on our mandate? The court below could not take the position which it

took at the trial of the cause on appeal at our No. 4414, viz., that the Clarke article, as part of file wrapper history, could be employed only to prove what had taken place in the Patent Office in respect to the Peiler application. This court settled the law of the case in that respect in our decision at No. 4414. The district court on original bills or bills for review would receive evidence as to the fraud practiced on this court in respect to the Clarke article. If it made a finding of fraud and as a result of that finding ordered the decrees entered on our mandates to be set aside, this court, on appeal, would be compelled to hold that the very fraud found was immaterial because file wrapper history is not competent evidence to prove the basic position of a patent in the art. The result would be farcical and the fraud which effected our decree would stand unimpaired.

I think there is a reasonable answer to these questions. The fraud is one which was worked, as I have stated, upon our appellate jurisdiction. It came within the ambit of this court on appeal. That fraud can be relieved of only by the exercise of our appellate jurisdiction precisely as the fraud worked upon the Circuit Court of Appeals for the Second Circuit could be cured only by that tribunal. If we do not exercise our jurisdiction the petitioners will be without relief from the fraud practiced upon this court. If fraud effected our decree at No. 4414, this court as a matter of justice should grant rehearings both at No. 4414 and at No. 5203.

Turning now to the petition at No. 4414, I cannot agree with the majority that it does not appear that the Clarke article was " * * * so basic to this court's decision in the Hazel-Atlas case that, upon the showing of fraud in the article's authorship, we would be justified in setting aside the orders in the Hazel-Atlas and Shawkee cases * * *." Judge Buffington's numerous and extensive quotations from the Clarke article indicate its importance to his decision. But one need not seek to deduce the court's mental processes. At an early point in the opinion, after tracing the

---

[1] In a letter dated May 25, 1926, from Henry W. Carter, then the secretary of Owens Bottling Company, to one W. H. Boshart, Carter stated in part, "He [Hatch] has prepared * * * [the Clarke article] * * * with the idea of getting it printed under the name of some apparently unprejudiced authority, and then calling the attention of the Patent Office Examiner to the article as published, in the belief that the Examiner will thereby be influenced to a more favorable consideration of Hartford's broad claims."

development of mechanical glass blowing, and referring to the Clarke article, Judge Buffington stated: "As we have indicated, the labor organizations were vitally interested in the supplanting of hand blowing by mechanical blowers, and we naturally look to the proceedings of their several organizations to find what machine blowers were of practical working capacity and ones which they regarded as supplanting lung blowing. We can therefore, and do, rely on their opinion in that regard, for successful machine blowers largely spelled ending of the supremacy of lung blowing." 59 F.2d 399, at page 401. Judge Buffington also stated, 59 F.2d at page 404, "This new machine and its new and differentiating elements were tersely stated in such [the Clarke] article as follows: 'Instead of employing a stream of glass which collected in the mold until the desired mold charge had accumulated, these new feeders cut off a suspended chunk or gob of glass which was pre-formed during suspension to correspond, to some extent, at least, to the shape of the mold cavity in which it was to be received.' We shall later see that in these few words this practical glass blower official summarized the novel characteristics of the machine which is the subject-matter of this suit. And be it observed, he notes the exact differences between Owens and this new machine."

Believing that the Clarke article actually represented the words "of a practical glass blower official",[2] the majority of this court brushed aside most pertinent evidence as to plunger-shear feeders of the prior art, saying, "We may safely assume these futile devices did not enter into the situation then and should not now, * * *." 59 F.2d at page 412.

Bear in mind that an important question before this court on the Hartford-Empire appeal was whether the claims in issue of the Peiler patent were entitled to a broad construction or whether they were to be construed narrowly.[3] If they were construed broadly they were infringed; but, if their scope was held to be narrow, they were not infringed. If Peiler's disclosures constituted a basic contribution to the art of glass blowing and bottle making, his patent was entitled to be treated as a basic patent in the art and his claims construed accordingly. The alleged dominant position of Peiler's device, supposedly conceded even by the president of a labor union antipathetic to such devices, was a most important factor in this court's decision. The court thought that the Clarke article represented the opinion of members of a labor union in respect to a labor saving device and said, "We can therefore, and do, rely on their opinion in that regard * * *".

Can it be believed that Judge Buffington would have quoted from or accredited the contents of this article if he had been aware that it had emanated from certain of Hartford-Empire's counsel who had employed it to perpetrate a fraud on the United States Patent Office? The answer must certainly be in the negative.

The majority state, "No substantial complaint has yet been made that what the [Clarke] article contained in material part, namely, the ascendency of gob-feeders over stream feeders, was factually false." But the alleged basic position and the asserted commercial success of the Peiler device were the important items which, in my opinion, caused this court to give the claims in issue a very broad interpretation. Moreover, whether the statement of the majority which I have quoted, be correct or not, seems to me to be immaterial in view of the fraudulent authorship of the asserted fact. The deception practiced in

---

[2] I have set out immediately below a number of other quotations from Judge Buffington's opinion which indicate his reliance upon the Clarke article.

"It is interesting to note that in that connection the trade, these labor organizations of practical workmen, recognized the fact that both the Owens and the Brooke devices were of the same character * * *". A quotation from the Clarke article follows. 59 F.2d 399, at page 403.

"In the practical work of that part of the glass-blowing art here involved, we regard Owens and Brooke as the only devices which caused any concern to the Glass Blowers' Union." 59 F.2d at page 406.

"The periodic, separated, individualized mold forms or gobs discharged by this current-intercepted process and its contrast with the continuous feed stream of the earlier art are described by the union official just referred to in language we now repeat and whose keen accuracy will be better appreciated from what has been shown in the intervening part of this opinion." 59 F.2d at page 407.

[3] The District Court had held the claims in issue to be not infringed even if valid. This court held the claims to be valid and infringed.

the Clarke article was pertinent in effecting the judgment of the majority of this court and therefore the lack of truth or the inaccuracies of the article, published under what is alleged to be a false authorship, also becomes pertinent.

A chart showing the "Relative Bottle Production on Machines and Gob Feeders" was attached to the Clarke article and was a part of it. This chart purports to demonstrate by two so-called "production" curves, the commercial success of the gob-feeder such as Peiler's. In a letter sent by Henry W. Carter, who was then the treasurer of The Owens Bottle Company, to Hatch, Carter stated, "Am not sure that I quite understand your 'increase' line. The falling off for Owens in 1921 was entirely due, I take it, to the general collapse of business during that year, and I should expect it to be more or less paralleled by a falling off in feeder production." Hatch wrote to Carter in reply, and stated in part, "I appreciate your comments very much indeed and I think there is but one point on which you failed to appreciate my exact position. That is, I prepared this article so far as possible with reference only to the proceedings of The Bottle Blowers Association and knowingly and intentionally I reproduced some of the errors found therein. For example, in any statement as to the number of Owens machines in use, I have used the numbers given in the proceedings, even when I knew this was not correct. The point I have in mind is that if I can get the President of the Association to publish this I thought that he should base all of his statements on their printed records except where such statements had a direct bearing on the particular point which we wished to bring out. I fully appreciate your remarks on the 'Brooke Flow', but I thought it necessary to go into this because page after page of the proceedings is taken up with the discussion of this device. In fact, it came close to causing as much discussion as did the Owens machine. Another reason for considering the Brooke Flow is the fact that the name which they have used throughout all of their proceedings, even up to date, comes from the Brooke device. That is they call all feeders 'Pouring' or 'Flow' devices. As I recall it the expression 'Gob Feeders' does not occur anywhere in the entire report."

Though the words last quoted show a deliberate intention to avoid truthfulness, the most important element of the fraud must be pointed out. It consists of nothing less than this. Apparently, at no place in the proceedings of the Bottle Blowers Association, to which Hatch referred, was any reference made to gob-feeders; viz., to devices such as Peiler's. The assimilation of gob-feeders such as Peiler's to the proceedings of the Bottle Blowers Association, when those proceedings in fact make no reference to them, is the heart and essence of the fraud. The fabrication was necessary to tie the Peiler device into the proceedings of the Bottle Blowers Association and thus, to deceive the Patent Office. I think that Judge Buffington and this court were deceived in precisely the fashion that Hartford-Empire intended.

As I have stated, the nature of the contents of the Clarke article and the chart attached to it was emphasized on the brief of Hartford-Empire.[4] The facts relating to the Clarke article were not before this court at the time the case was argued. It is true, as the majority state, that counsel for Nivison-Weiskopf Co. informed counsel for Hazel-Atlas that Hatch had written the Clarke article at the time of the trial of the suit of Hartford-Empire v.

---

[4] The brief stated:

"2. *It broke the Owens Domination.* The article by Mr. William Clarke, former President of the Glass Workers' Union (Rec. V, 592, et seq.), gives an admirable outline of the effect of the Peiler plunger feeder on the Owens machine business. His chart reproduced opposite this page (Rec. V, 602), showing the production curves of the two types of machine, speaks for itself. The Owens reproduction line begins at zero in 1905 and goes to its high point of 12 million gross in 1919. Alongside of it the 'gob feed' (suspended charge feed) production curve begins at zero in 1917 and goes to 9 million gross in 1925. The Owens curve practically ceases to rise after 1919, that is, as soon as there was substantially competitive production by the suspended charge or 'gob' feeders.

"In fact, the Owens Company itself began the use of the reciprocating plunger feeder in 1920 (Rec. I, 289). *It is now an important licensee of the plaintiff's plunger feeders* (Rec. I, 237, 289). The Owens Company, the largest glass producer in the country, was forced 'by the hard facts of actual commercial competition' to recognize Peiler's system as a radical advance (Rec. V, 682, 603)."

Hazel-Atlas in the court below. But it must be borne in mind as I have repeatedly stated that the file wrapper history of the Peiler patent which contained the Clarke article was offered in the court below only to show what had been before the Patent Office and was competent evidence for no other purpose. I think that counsel for Hazel-Atlas could not have kept the file wrapper history out of the record for the purpose for which it was offered and I doubt that proof of the Clarke article's authorship would have been pertinent or admissible at the trial. Counsel for Hazel-Atlas were not negligent at the time of the trial in not endeavoring to prove that Hatch had written the Clarke article. It was not until the appeal came before this court that counsel for Hartford-Empire brought the article forward as proof of the dominant position of the Peiler device in the art. As already stated this court accepted the article not to show what had transpired in the Patent Office but as proof of dominant position and commercial success. That a circuit court of appeals should treat matter contained in the file wrapper history of the patent in issue as offering proof of dominant position in the art is so extraordinary, that, in my opinion, counsel for Hazel-Atlas could scarcely be expected to endeavor to adduce evidence that Hatch had written the Clarke article when their opponents offered it as such proof to this court. It was not until this court had pursued the extraordinary course of accepting the Clarke article as proof of Peiler's position and had demonstrated this in its opinion, that Hazel-Atlas attempted to find proof to present to this court that Hatch had written the Clarke article.

An affidavit was procured from counsel for the Nivison-Weiskopf Company on or about May 17, 1932, and Hazel-Atlas engaged a firm of private detectives to make an investigation. An employee of this firm, McCarthy, promptly proceeded to try to get the essential information from Clarke. Clarke refused to give McCarthy the facts concerning the fraud and informed him that he, Clarke, had in fact written the article and had done so for the public good.[5] Clarke even refused to furnish Hazel-Atlas with a photostatic copy of the article. At about this time, May 20, 1932, Clarke demanded of Hatch or Hartford-Empire the sum of $10,000. Hatch or Hartford-Em-

pire shortly thereafter paid Clarke $8,000 in cash and Hartford-Empire gave him a retainer contract to endure for a period of five years. In connection with the payment to Clarke, Hatch wrote Carter a letter dated May 28, 1932, and stated in part, "We are quite indebted to Mr. Clarke. While it is true that he has done nothing beyond what would be expected of any reputable man, nevertheless, without violating any confidence or doing anything of a questionable nature, he might easily have caused us a lot of trouble. This should not be forgotten * * *." These words are cloaked to the teeth. The payment of $8,000 in cash under the circumstances was peculiar indeed. The retainer agreement so suddenly effected between Hartford-Empire and Clarke seems to possess similar characteristics. I shall not set out in this dissenting opinion the other letters written by Hatch to officers of Hartford-Empire and Owens Illinois Glass Company at this time, but an examination of this correspondence will lead, I think, to the conclusion that Clarke was being taken care of lest he tell the truth. Under these circumstances, I think that the conclusion is inevitable that Hazel-Atlas could not possibly have brought competent proof of the facts to this court following the argument of the cause, or any time thereafter, until the United States Government brought out the truth from witnesses under oath at the time of the trial of the cause of United States against Hartford-Empire Company, Hazel-Atlas Glass Company, Owens Illinois Glass Company, and others, No. 4426, in the Northern District of Ohio in 1941. [See 46 F.Supp. 541] Knowing that something is the fact and possessing the ability to prove it are two very different things. Hazel-Atlas was in the position of "knowing" or vehemently suspecting the truth but was not in a position to be able to prove the facts to this court.

The majority opinion lays emphasis upon the fact that after the decision of this court on May 5, 1932, Hazel-Atlas failed to file a petition for rehearing. In the majority view the petition for rehearing should have included two items: first, the fraud embraced by the Clarke article; and, second, the fact that file wrapper history had been considered as evidence of the Peiler patent's alleged dominant position in the art. The majority imply that the reason that a peti-

---

[5] According to McCarthy's report, Clarke stated: "I wrote that article in the interest of the general public, and I'll stick to that."

tion for rehearing was not filed was because of the settlement effected between the litigants on July 21, 1932. I do not doubt that this is the reason. But emphasis should be laid upon the fact that Hazel-Atlas by five separate stipulations approved by this court, kept the way open to file a petition for rehearing while an investigation of the Clarke article was being made. The majority treat this investigation as not having been made strenuously, but I think that the affidavits filed with us indicate the contrary. The contents of the Clarke article was the thing upon which this court placed its primary reliance in effecting a broad interpretation of the Peiler claims in issue. Had Hazel-Atlas been able to produce substantial evidence to prove the fraud, it is very probable that a petition for rehearing would have been filed. It should be noted, however, that McCarthy was unable to get any useful information from Clarke in the two interviews he had with him. The majority suggest that Hazel-Atlas did not exercise diligence because its representatives did not interview Hatch who might have stated the facts in respect to his authorship of the Clarke article if given the opportunity to do so at this time. This is a suggestion scarcely justified by the record for Hartford-Empire or Hatch paid Clarke $8,000 within a short time after McCarthy's final interview with him. It was not necessary for Hazel-Atlas to have taken such a vain step in order to be able now to prove its diligence. If I am correct in my conclusions, Hazel-Atlas, lacking competent proof of the fraud, in its petition for rehearing would have had to have made serious charges against Hartford-Empire and three of its counsel basing its allegations on hearsay evidence which it had been unable to substantiate. This is a course upon which a prudent litigant should and would embark

with great reluctance. It should be observed also that when Shawkee's counsel in 1933 brought proof, substantially similar in nature to that which Hazel-Atlas could have offered in 1932 to this court, the court did not act upon it, presumably because it was not evidence of such a kind or of such weight as would justify action.

As to the failure of Hazel-Atlas to file a petition for rehearing on the legal ground that this court had treated a part of a file wrapper history as evidence of the dominant position of the Peiler patent in the art, I agree with the majority that Hazel-Atlas should have done so, but to say this is not to concede that the failure of Hazel-Atlas to call this court's attention to its error of law is sufficient now to debar it from relief. We are dealing with a matter of great substance, with a fraud perpetrated upon this court. The failure to file a petition for rehearing in respect to a matter of law after an adverse decision should scarcely be considered as a matter of great substance under the circumstances. As to the settlement effected on July 21, 1932, it is a matter of speculation as to why Hazel-Atlas made it. Hazel-Atlas probably made the best of a bad position and settled the litigation because it had lost its case, but that settlement scarcely included waiver of or acquiescence in a fraud.

As has already been indicated, the Shawkee case, No. 5203, came before this court after the disposition of the Hazel-Atlas case, No. 4414. It was ruled by the decision in the Hartford-Empire case.[6] On October 30, 1933, before the decision, counsel for Shawkee having first written to counsel for Hartford-Empire, wrote to Judge Buffington and made the direct allegation that Hatch had written the Clarke article. He submitted with his letter eight papers, the titles of which are set out in the margin.[7]

[6] The fact that Judge Woolley, who dissented sharply from the majority opinion in the Hazel-Atlas case did not do so in the Shawkee case, 68 F.2d 726, indicates only that he followed the principle of stare decisis. Judge Woolley in his concurring opinion stated, 68 F.2d 727, "Regarding myself bound by that decision of the court [the decision in the Hazel-Atlas case], I concur in the findings of validity and infringement of the claims here in suit."

[7] 1. Letter from Hartford-Empire Company, by R. F. Hatch, to National Glass Budget, dated July 9, 1926.

2. Letter from National Glass Budget, by A. W. Kimes, to R. F. Hatch, dated July 12, 1926.

3. Letter from Budget Publishing Company to William P. Clarke, dated July 13, 1926.

4. Letter from Hartford-Empire Company, by R. F. Hatch, to A. W. Kimes of National Glass Budget, dated July 14, 1926.

5. Certified copy from Patent Office in the matter of Peiler patent No. 1,655,-391, including certificate dated October 10, 1933, six typewritten pages, the first of which contains the Patent Office stamp

On November 17, 1933, counsel for Hartford-Empire wrote a letter to Judge Buffington and stated " * * * the fact that the Clarke article was transmitted to the Glass Budget by Mr. Hatch of the Hartford-Empire Company was known both to the Hazel-Atlas Company and the Nivison-Weiskopf Company counsel *prior* to the trial of the latter case and at least *during* the trial of the Hazel-Atlas case." It will be observed that counsel for Hartford-Empire made use of the word "transmitted" in respect to the Clarke article and that he did not admit that the Clarke article had been prepared for The Glass Budget by Hatch.

Following the letters between counsel for Hartford-Empire and Shawkee, this court had before it allegations which cast doubt upon the source of the Clarke article. The documents accompanying Shawkee's counsel's letter, which I have set out in note, 7, supra, do not prove that Clarke's article was written by Hatch or that Clarke was not a disinterested person. The contents of the documents are consistent with the theory that Clarke himself had written the article and had done so as a matter of public interest. The statements contained in Shawkee's counsel's letter to Judge Buffington, as I have already stated, did make a direct charge of fraud. So far as this court was concerned, however, they were hearsay twice or thrice removed from the source and were made by an interested person acting on behalf of a litigant. Under the circumstances this court might not have been justified in embarking upon a full-scale investigation in determining the truth or falsity of the charges. It was not until the suit of United States v. Hartford-Empire and others, which I have mentioned, came to trial in the United States District Court for the Northern District of Ohio, Western Division, and the Government had completed its proof on October 22, 1941, that the facts relating to the Clarke article came out of the land of hearsay and Hazel-Atlas and Shawkee could prove what they had theretofore known or suspected. Both acted promptly immediately thereafter and filed their petitions in this court. I think that we should give the petitioners full opportunity to prove the nature of the fraud which was practiced upon this court and that that fraud caused this court to give a broad instead of a narrow construction to the claims of the Peiler patent in issue resulting in the decrees complained of. If such proof is made I think we have the power to set aside our decrees and our mandates and grant rehearings and that we should do so.

In saying this I am not unmindful of the statements made in the majority opinion that Owens Bottle Company, later Owens Illinois Bottle Company, and Hazel-Atlas made their peace with Hartford-Empire by cross-licensing settlements and thenceforth became interested in sustaining Hartford-Empire's patents.[8] But as was stated by this court in Cridlebaugh v. Rudolph, 131 F.2d 795, 800, citing Densmore v. Scofield, 102 U.S. 375, 378, 26 L.Ed. 214, there is a duty to protect the public from an unwarranted monopoly imposed by a patent. Quite aside from this, however, we have the duty to preserve the integrity of our appellate jurisdiction against fraud. As I see the facts, action upon that duty is clearly imposed upon us by the petitions at bar.

For these reasons I must respectfully dissent from the majority opinion. We should act on the petitions as the facts and the law require.

---

"Filed Oct. 12, 1926.", and front cover page of National Glass Budget for July 17, 1926.

6. Typed manuscript of Clarke article.

7. Copy of letter from Mr. Barnett to Hon. Thomas G. Haight, dated October 20, 1933.

8. Copy of letter to Hon. Thomas G. Haight to Mr. Barnett, dated October 24, 1933.

[8] It should be noted in this connection that paragraph 9 of the petition filed on behalf of the United States as Amicus Curiæ makes the following allegations:

"9. Immediately following the decision of the Court in the Hazel-Atlas Suit (No. 4414) representatives of Hartford communicated with the President of Hazel, and it was suggested that an arrangement could be worked out whereby Hazel could have a license under the Peiler patent here involved with a share in Hartford's royalties from other licensees, if Hazel would agree (1) not to file a petition for a rehearing in this Court and (2) not to file a petition for certiorari to the Supreme Court. Hazel accepted these conditions, paid a million dollars damages, and took a license under the Hartford patent."

The facts in respect to the relations of Hartford-Empire to Hazel-Atlas and other companies are referred to rather fully in the opinion of Judge Kloeb in United States v. Hartford-Empire Co., D.C., 46 F.Supp. 541, 545, 547 et seq.