**FIRST NATIONAL BANK OF ARIZONA, as successor executor of the last will and testament of Gerald B. Waldron, Deceased, Plaintiff,**

v.

**BRITISH PETROLEUM CO., Ltd., Socony Mobil Oil Co., Inc., Standard Oil Co. of California, Standard Oil Co. (New Jersey), Texaco, Inc., Defendants.**

**Civ. No. 110–223.**

United States District Court,
S. D. New York.
March 25, 1971.

Casey, Lane & Mittendorf, New York City, for plaintiff; by William E. Kelly, and Alan R. Wentzel, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant Standard Oil Company (New Jersey); by Arthur H. Dean, Roy H. Steyer, and Robert G. Sugarman, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, by James Withrow, Jr., and John Wilkinson, New York City, of counsel; Mudge, Rose, Guthrie & Alexander, New York City, by Goldthwaite Dorr and Gerald Feffer, New York City, of counsel, for defendant Socony Mobil Oil Co., Inc.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendant Standard Oil Co. of California; by William Sayre, Michael Armstrong and Rodney Dowling, New York City, of counsel.

John Van Voorhis, New York City, Pollack, Singer, New York City, for defendant British Petroleum Co., Ltd.; by Richard M. Asche, New York City, of counsel.

William C. Weitzel, Jr., New York City, for defendant Texaco, Inc.; and Edmund Burke, Jr., New York City, of counsel.

## OPINION

CROAKE, District Judge.

The motions in this case now before the court provide a study in the complications often attendant upon private antitrust litigation. Indeed, it is not an easy matter to determine exactly what the present posture of this case is.

The following is a recitation of the relevant facts, as compiled by this court from examination of the depositions and affidavits, and as abstracted from the decisions of other judges previously involved in this case.[1]

In March and April of 1951 Iran nationalized its oil industry, thereby abrogating the concessions held by the Anglo-Iranian Oil Company (now British Petro-leum). The resulting shutdown of the then world's largest refinery deprived Iran of its largest source of income, and led to United States fears of a Communist coup d'etat and to severance of diplomatic relations between Iran and Great Britain.

In November of 1951, Richard S. Nelson, an export manager for local firms in Denver, Colorado received a letter from an Iranian resident, James A. Raphael, asking whether he knew of anyone interested in bartering sugar for oil. Nelson approached Waldron, a broker of foods (not including sugar), then dealing primarily in dairy products in an adjoining office under the name of Consolidated Brokerage, with Raphael's proposition. When a barter of oil for sugar proved impracticable, the attention of Raphael, Nelson, and Waldron turned to a direct sale of oil. Waldron wrote Senator Johnson of Colorado to ascertain the attitude of the State Department to their involvement in such a sale. The reply was negative but not preclusive.

Nelson cabled Raphael stating (falsely) that he had cash purchasers for 2 million tons of oil. Raphael communicated this information to the National Iranian Oil Company ("NIOC," an instrumentality of the Iranian Government), which responded by expressing interest in a more extensive deal encompassing 15 million tons of oil over 5 years. Nelson replied that this proposition was acceptable to his "principals." Raphael indicated the necessity for bribery of Iranian officials, although Waldron later contended that he had refused to be party to any bribes. Additional false information was sent Raphael.

Eventually, Waldron and Nelson went to Iran. While there, they disclosed that they were not in the oil business and did not intend to sell the oil themselves, but nevertheless they obtained the "contract" which defendants now attack.

On their return, they informed Senator Johnson of their activities, and various members of the group, which by this

1. A chronology of the proceedings in this case, with citations to reported opinions, is attached as an appendix hereto.

time consisted of Waldron, Nelson, James A. Bentley, a New York management consultant, and James E. Zoes, recruited while Waldron was in Iran (all inexperienced in oil dealings), attempted to implement or assign the contract. The possibility of buying or renting tankers was investigated. An offer to sell the oil to some of the larger oil companies was made and quickly rejected. The First National Oil Company of Long Island proved equally reluctant.

Several meetings between the Waldron group and Cities Service produced an agreement whereby Waldron was to obtain an invitation for Cities' president, W. Alton Jones, to make an unpublicized visit to Iran, and in return the Waldron group was to receive one or two cents per barrel of oil run through the Iranian refinery, should Cities and the Iranian government successfully negotiate a management contract. The invitation was obtained, and Jones went to Iran and met with the Prime Minister of Iran. However, Jones may also have gone to Kuwait, without informing Waldron of the fact; in any event, Cities Service determined not to participate in the exploitation of Iranian oil resources.

In December of 1952 NIOC extended the impending expiration date of the contract until June of 1953. Prior to that date, offers to Sun Oil and to the Richfield Oil Company (in which Cities had a substantial interest) were made; the offer to Sun had been rejected when the June deadline arrived; that to Richfield was rejected at a later date. Among other parties solicited, unsuccessfully, were the Nationalist Chinese, and, with regard to aviation gasoline, the United States Air Force.

The present posture of the case presents three motions for determination. The first motion is by all defendants ("Defendants' 1970 motion"), and seeks summary judgment and dismissal on the ground that plaintiff[2] lacks business or property under Section 4 of the Clayton Anti-Trust Act of 1914 ("The Clayton Act"), 15 U.S.C. §§ 12–27, 15, which states:

Any person who 'shall be injured in his *business or property* by reason of anything forbidden in the anti-trust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. [Emphasis supplied.]

The second motion is by defendant Texaco, Inc. ("Texaco's motion"), and seeks summary judgment in its favor for lack of a controverted issue of fact.

The third is a cross-motion by plaintiff, seeking: (a) dismissal or denial of defendants' 1970 motion as barred by principles of "law of the case"; (b) denial or adjournment of Texaco's motion either because a fact issue exists, or because a determination would be premature until plaintiff has had an opportunity for discovery; (c) if motion "(a)" is denied, an adjournment for the purpose of ascertaining the applicable Iranian law, which adjournment defendants have stipulated to consent to, if the court should reach it; and (d) for a date by which defendants must answer or object to the interrogatories (119 pages) propounded by plaintiff on October 15, 1968.

I

Defendants' 1970 motion is unusual in that, after fifteen years of strenuous litigation, it now in essence revives their eight-year old challenge to plaintiff's standing. Plaintiff's response, which makes manifest the problems involved in the management of "big" cases, is, *inter alia*, that defendants' 1970 motion duplicates their motion, denied by the late

---

2. Present plaintiff is successor executor to the last will and testament of Gerald Waldron, described above, deceased in 1964.

References to "plaintiff" are to Waldron or present plaintiff, as the context may indicate.

Judge William B. Herlands of this court in 1964, and therefore is barred by principles of *stare decisis* and "law of the case."

Defendants agree that the earlier motion in question was also grounded in an attack on plaintiff's standing, but contend that the present motion states additional facts and a different legal theory. They assert that the earlier motion was addressed to the argument that, irrespective of the nature or legal effect of the "contract" between plaintiff and NIOC, plaintiff's lack of experience or qualifications, and the unprincipled and illegal nature of his activities, precluded a finding that he possessed "business or property." They contend that the validity of the contract itself was not challenged as it is by their 1970 motion.

Judge Herlands decided, in a learned and exhaustive opinion, dated June 23, 1964, and reported in 231 F.Supp. at 72–97, that under United States anti-trust law, while plaintiff did not possess "business," he did have "property" in the form of an option contract,[3] to which property the alleged acts of defendants had caused direct and primary injury. The Judge therefore concluded, interpreting the "business and property" clause to state two disjunctive tests,[4] that the plaintiff did in fact possess standing under Section 4 of the Clayton Act.

It is not asserted that this court lacks the power to modify Judge Herlands' decision, under the rule of Dictograph Products Co. v. Sonotone Corp., 230 F.2d 131, 134 (2d Cir. 1956), nor is it argued that the decision, a landmark in anti-trust law, was in error in its analysis of Section 4 of the Clayton Act. Rather, the dispute focuses on conflicting interpretations of the scope of that decision, and on whether or not defendants have now introduced sufficient new facts or

theories to warrant the exercise of this court's discretion by hearing their 1970 motion. This court is not, at the present time, being asked to determine the merits of either defendants' 1970 motion or Texaco's motion, but only whether it will choose to do so.

▮ Accordingly, this opinion will first outline the nature of defendants' 1970 motion, without prejudice to possible re-analysis should it later be heard on the merits. The next subject dealt with will be plaintiff's claim that defendants are estopped from bringing on this motion, or that this court should refuse to hear it for reasons of law of the case.[5] The third topic will be defendants' standing to assert the arguments attacking plaintiffs' contract; in other words, defendants' standing to attack plaintiff's standing. The fourth subject will be the analysis of the procedural questions raised herein, and this court's conclusions regarding defendants' 1970 motion and plaintiff's cross-motion addressed thereto. Finally, plaintiff's objections to defendant Texaco's motion will be considered.

## A—NATURE OF THE MOTION

At the time of the argument before Judge Herlands, the parties evidently assumed that the contract, if not void or voidable for illegality or violation of public policy reasons, would be considered valid for purposes of this action. Analysis both of Judge Herlands' opinion, especially at page 91, and of the transcript of the hearing held before him in connection therewith,[6] demonstrates that the challenge to the contract raised at that time was different from this attack.

Defendants now seek to reopen their attack on plaintiff's contract. To summarize their present position, they contend that their assumption of validity

3. 231 F.Supp. 78n. This opinion will hereinafter be referred to as "the Decision."

4. Decision, at 86.

5. Strictly speaking, a question involving reconsideration by one judge of the ruling of a brother judge, rendered in an

earlier stage of the same case, involves the doctrine of law of the case, rather than *stare decisis et non quieta movere.* MOORE, FEDERAL PRACTICE, ¶¶0.-402, 0.404.

6. Held on September 3, 1968, esp. at 32–33.

was made *arguendo*, and that the contract was in fact intrinsically invalid, and void *ab initio*. Defendants base this assertion on analysis of the law of Iran, which they argue would govern any action on the contract between the parties to it, and therefore should provide the source for the legal rules of interpretation of the contract for purposes of Section 4 of the Clayton Act. Defendants conclude that the "contract" was at all times worthless, and therefore could never have constituted "property" under the Clayton Act.

It should be emphasized that, while defendants' assertion of Iranian law raises a question of "conflicts of law," it does not involve "choice of law." Regardless of the eventual dispositions of the present motions, the law of this case will remain United States anti-trust law, and specifically the Clayton Act. The term, "property," as used therein will continue to be defined as "an interest which the [United States] law protects," to quote Judge Herlands.[7] The determination of whether plaintiff's interest was sufficiently valuable to warrant protection, *i. e.*, as "property," will still involve a value judgment based upon interpretation of the public policy expressed in the Clayton Act.[8] Resort to Iranian law, therefore, would be for the purpose of ascertaining the value of plaintiff's property, "a datum which is rendered material by the rule of decision which is found in the law of the forum."[9] To paraphrase: the availability of defenses in the nature of attacks upon a contract by a party not signatory thereto is a question of United States anti-trust law, although the defenses asserted may have arisen under foreign contractual law.

The question of whether the plaintiff in this action possessed property is to be determined essentially through analysis of the strength of his business ties with NIOC. The parameters for this determination have already been established; Judge Herlands has determined that a "mere advantageous business relationship" would be insufficient, but that a "contract" would satisfy Section 4 requirements.[10] The additional facts asserted in the present motions present the court with an intermediate situation: a "contract" which is "infirm." Since the dichotomy permits of only two choices, it becomes necessary to determine whether what plaintiff possesses comes close enough to being a contract to escape the consequences of characterization as a mere business relationship.

### B—TIMELINESS

In light of the procedural history of this litigation, an obvious issue arises concerning the timeliness of defendants' 1970 motion. For, when dealing with unusual issues of conflicts of law,

> "The invocation [sh]ould have to be timely; the ground rules for the litigation [sh]ould be settled at the outset. There [sh]ould be no question of the foreign law hanging nimbus-like over the litigation, all-powerful in spite of ignorant neglect, ready to take over the moment anyone happens to notice it."[11]

Two questions arise in this connection. The first relates to the extent to which the ground rules for this litigation have been or remain to be set. The second, which assumes that it has not yet been decided what law governs questions of contractual validity, relates to the possi-

---

7. Decision, at 86.

8. See *loc. cit.*

9. CURRIE, On the Displacement of the Law of the Forum, 58 Col.L.Rev. 964, 1003 (1958); reprinted in Selected Essays on the Conflict of Laws (1963) ("CURRIE"). *See*, KAY, Conflict of Laws, Foreign Law as Datum, 53 Cal.L.R. 47 (1965), Note, 49 Cal.L.R. 962, 967–968 (1961).

10. Decision, at 84–86. See part I, section B of this opinion, *infra*, for analysis of the effect on this court of Judge Herlands' determination of issues in the case.

11. CURRIE, at 1003.

bility of estoppel of defendants from raising the issue at this late date.

## LAW OF THE CASE

A superficial reading of Judge Herlands' prior opinion in this case, discussed above, might lead to the conclusion that it absolutely forecloses inquiry into the subject matter of defendants' 1970 motion. For the Judge stated, "Plaintiff's NIOC contract was lawful and enforceable." [12]

However, this comment was made in the context of a rejection by the court of defendants' attacks on the contract as procured by illegal and fraudulent conduct. Judge Herlands' determination was merely that any illegality was collateral, and that the alleged fraud was an issue which defendants were without standing to assert.[13]

■ This is not to say that Judge Herlands so restricted his consideration of contractual validity as to wholly refrain from consideration of all objections not explicitly raised. Rather, in connection with his conclusion that plaintiff possessed property, the Judge necessarily determined that, as against the challenges then available to defendants, the contract was valid and enforceable. This court holds that determination binding upon it; not only has no reason been asserted for departing from the law of the case in this respect, but also the court has necessarily, through its examination of the record and consideration of the legal principles involved in this case, come to the independent conclusion that Judge Herlands was and remains correct.

His ruling therefore does not completely foreclose defendants' 1970 motion. It is axiomatic that a contract may be valid under the rules of one legal system, and at the same time be void under those of another. This danger to contracting parties has provided the impetus for such private choice of law rules as, for example, U.C.C. 1–105(1).[14]

Judge Herlands was properly unconcerned with the status of this contract under the then unasserted alien, and possibly exotic, law; his opinion should not be blindly extended to include this issue. *See* Cohens v. Virginia, 6 Wheat. 264, 399–400, 19 U.S. 264, 5 L.Ed. 257, 290. Nor did or should he have found it necessary to raise and determine *sua sponte* the rather abstruse question presented by defendants' 1970 motion.

The precise nature of the contractual infirmities allegedly existing under Iranian law cannot be determined on the present record. Until such a determination can be made, the exact precedential effect of Judge Herlands' decision cannot be resolved. Plaintiff's cross-motion must therefore be denied at this time and on this record, in so far as it is predicated upon an assertedly preclusive law of the case.

However, this court will not allow defendants to obtain unjustified reconsideration of issues once raised and determined as questions of United States law by reframing those same issues as questions of Iranian law. If it should later appear that the elements of Iranian law asserted involve the same legal considerations as those evaluated by Judge Herlands, his rejection of them must be adopted by this court as its own.

## ESTOPPEL

■ The defendants apparently failed to raise the precise issue involved in their 1970 motion when they sought summary judgment for the first time, in 1963 and 1964. The question therefore arises whether this failure should cause them to be held estopped from raising the issue at the present time. Estoppel would allow plaintiff finally to conduct pre-trial discovery, and all parties would

---

12. Decision, at 92.

13. Decision, at 92–93.

14. No election as to governing law appears to have been made by the parties to the instant contract.

avoid the delay and expense of demonstrating the content of Iranian law to the court.

Nevertheless, the balance of equities favors refusal to hold defendants so estopped. In 1966, proof of foreign, non-Anglo-American law was a question of fact. F.R.Civ.P. 44.1, added in 1966, made this a question of law for the first time.[15] Therefore, in 1963, when the original motion was made, assertion of Iranian law would have raised a "fact issue" prejudicing the entire motion.

The 1970 motion was not made from 1966 to 1970, apparently because most of the time from 1964 to the present was taken up with plaintiff's opposition to and appeal from the dismissal of the case as to a former co-defendant, Cities Service Corp., and by the death of Judge Herlands.

These facts do not provide a complete justification for the failure to raise the issue in 1964. Although proof of foreign law was a fact issue in 1964, it was triable to the court, not the jury. And the same evidence was admissible as is presently. It may, then, have been possible that the raising of this issue by affidavits in a summary judgment motion in 1964 would not have resulted in denial of the entire motion; Judge Herlands might have made a specific finding on this issue. And defendants did not note the existence of the Iranian law issue, and request that their rights to raise it at a future time be explicitly preserved. *See* NUSSBAUM, Problem of Proving Foreign law, 50 Yale L.J. 1018 (1941).

However, on balance, since any procedure which the defendants could have utilized to raise or preserve the issue would have been cumbrous and perhaps dangerous to defendants' entire motion, they cannot justifiably be penalized now for avoiding the problem in 1963. Nor can plaintiff reasonably claim that it has relied upon their failure so to move at that time, or that it is prejudiced in any significant respect.

For that matter, the entire issue of the applicability of Iranian law is one not readily apparent from investigation of the facts of this case as they refer to the relationship of the parties to this suit. The entire issue may have been overlooked by defendants until a time after Judge Herlands had denied their motion. It should be noted in this regard that defendants were aware of the Iranian law issue by as early as January of 1965, the time of their two written requests for expert legal opinions from their Iranian experts.[16] If there were evidence that defendants had been aware of this issue at the time when their motion was pending, and had refused to raise it solely for strategic reasons, then this court would be compelled to invoke the

> "obviously sound policy of preventing litigants from abiding the outcome of a lawsuit and then overturning it if adverse upon a technicality of which they were previously aware." Glidden Company v. Zdanok (1962), 370 U.S. 530, 535, 82 S.Ct. 1459, 1465, 8 L.Ed. 2d 671.

However, as had been stated, *supra*, there is no evidence that defendants were aware of this issue at the time of their earlier summary judgment motion; and furthermore, there were sufficient reasons for them to have avoided it if they had been aware. Upon this record, therefore, plaintiff's assertion of estoppel must be rejected.

## C—STANDING

 With regard to defendants' standing to bring on their 1970 motion,

---

15. Rule 44.1 states:

"A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43. The court's determination shall be treated as a ruling on a question of law." Added Feb. 28, 1966, eff. July 1, 1966.

16. The opinions rendered in response to these requests were sworn to in 1970.

certain principles can be stated. The first is that it appears to be essential to the effectuation of the legislative purpose embodied in Section 4 of the Clayton Act that defendants in civil anti-trust actions based upon infringement of contract be allowed to raise at least certain challenges to the validity of the contract asserted to be "property." If such were not the case, Section 4 would become a mere pleading requirement, and cease to be a part of plaintiff's prima facie case.

■ The second principle is that a defendant in an anti-trust action, who is a stranger to a contract therein involved, should not be completely free to raise any attack whatsoever upon the contract.[17]

In the light of these principles, the nature of defendants' 1970 challenge to the contract will be examined. Defendants' present challenge is that certain acts, allegedly necessary in order to create a binding contract, were consciously left unperformed. The following acts are listed:

a. A forfeitable deposit [of $320,000] be tendered to guarantee plaintiff's performance.

b. Plaintiff tender a letter of credit in a specified amount to pay for oil purchases under the contract.

c. On receipt of the letter of credit, the signed originals of the contract, previously retained by NIOC, be deposited in escrow with a New York bank until such time as the first tanker of oil was paid for.

d. The provision be executed which provided that, "This agreement shall only become effective when the second tanker of not less than 10,000 metric tons arrives in Iranian waters and the remaining portion of the first letter of credit has been credited to [NIOC's] account."

None of the above conditions ever occurred. A letter of credit was tendered, but it was apparently not of the "Irrevocable Letter of Credit" type contemplated by NIOC,[18] and therefore was rejected.

The actions to be taken under requirements "a," "b," and "d" were arguably within the control of plaintiff, and were allegedly not performd solely because of defendants' acts herein sued upon. But requirement "c," defendants allege, reflected, and was inserted in the contract in order to comply with, the relevant provisions of Iranian law.

Defendants argue that this requirement, necessary under Iranian law in order to create a binding contract, was consciously not performed. The availability of this argument as a defense to this action might well depend upon the characterization which this or another United States court would give to the allegedly governing Iranian law. Under United States law, some defenses, for example, the Statute of Frauds, are generally not available to third parties. Williston, Contracts, Third Edition, § 530.

One such challenge, which Judge Herlands has already disallowed, was defendants' attempt to raise the defense of fraud in the inducement. A party who has been fraudulently induced to transfer title to goods has the personal option under common law to treat his contract as either voidable or effective. The existence of this personal right to affirm or rescind does not, however, infer any right accruing to third parties to challenge the transfer of title to either the fraudulent party or his successors in

---

17. A defendant's rights in this regard might be analogized to those of a defendant in a tort action for interference with contractual relations. However, since a tort action generally reflects a policy of protection of a more limited group than does an anti-trust action, the potentially greater effect of an adverse decision in the anti-trust situation might justify granting somewhat greater latitude in that case. See PROSSER, TORTS, Second Edition, 720, *et seq.*, for the nature of the tort.

18. See U.C.C. § 5–103.

interest. Levy v. Cooke, 143 Pa. 607, 614, 22 A. 857 (1891), Williston, § 1489. Applying this reasoning to options to acquire title, Judge Herlands correctly concluded that, "defendants, strangers to the contract, cannot exercise the personal power and privilege of the Iranians and disavow the contract." [19]

It may be that the unperformed Iranian requirements which are alleged to have voided the contract *ab initio* are essentially formalities, in the nature of an Iranian Statute of Frauds. If so, under United States common law of contracts, they might not be assertible by strangers to a contract. If it be assumed that United States anti-trust law would generally follow United States contract law as to availability of defenses, assertion by the present defendants of the unperformed requirements might not be allowed in this action.

On the other hand, it may be that a different analogy between the asserted Iranian law and the law of this country would convey a more accurate impression of the content of the relevant Iranian law, and that under such an analogy the alleged contractual defect would be of a nature assertible by the present defendants.

It may also be that, under relevant Iranian law, the question of defendants' standing to attack the contract is for some reason indivisible from the substantive Iranian rule herein asserted. If such should prove to be the case, Iranian law might be so disparate as to preclude any effective resort to domestic legal analogies. This court would then have to undertake a careful analysis of the nature of the Iranian law in order to be able properly to frame and determine the conflicts question.

For that matter, it may be that all the requirements which are alleged to have been unperformed were designed to protect NIOC against the dangers of plaintiff's insolvency during the period of prospective performance, and against the possibility that NIOC would be forced to come into a United States court to assert or defend its rights under the contract, should a controversy arise. In other words, the requirements might have been in the nature of conditions subsequent, designed to regulate the parties' performance, but not to prevent the creation of a contract.[20]

The court expresses no opinion at this time as to which United States legal analogy, if any, would accurately describe the effect of the asserted Iranian law on the unperformed provisions of the contract. Such an opinion would be premature until the plaintiff has had an opportunity to express its opinion as to the effect of Iranian law herein; or in other words, until defendants' 1970 motion is dealt with on the merits. Therefore, since defendants' motion cannot be dismissed on standing grounds until the nature of their argument is more apparent, plaintiff's cross-motion must be denied in so far as it requests this relief on this ground.

## D—VALUE

■ It remains to be determined whether, assuming plaintiff's proce-

---

19. Decision, at 92. Note that the question of title to the oil, under the contract or otherwise, is to be distinguished as a conflicts-of-law issue from that of the existence *vel non* of the contract. See *infra*.

20. One factor complicating resolution of defendants' 1970 motion is that it seeks summary judgment. The existence of a material and controverted issue of fact will defeat it. One fact issue is the intent of NIOC to enter into a binding contract. If their or plaintiff's intent had been to fabricate a "sham" contract, which would have amounted to no more than an advantageous business relationship, then this action would clearly fail, although no motivation in this direction has been demonstrated. However, the issue of whether the bargaining between plaintiff's group and NIOC was initiated and pursued with the mutual intention of achieving a contract if possible—i. e., was in "good faith"—is one of fact, for trial.

dural challenges to defendants' right to bring on their 1970 motion all fail, defendants' argument is well taken. In this regard, it has already been determined that the "Section 4 issue" can be resolved into whether, whatever plaintiff's document may have been, it was sufficiently valuable to deserve the protection of this court. Plaintiff, on this point, strenuously argues that knowledge of the law governing construction of the instrument is irrelevant in the determination of its value, in the absence of any indication that such construction would have proven necessary. In other words, so long as NIOC expressed its unqualified willingness to perform, the legality of its obligation to do so was of no import.

For present purposes, "value" could be defined as "anticipated profit discounted by anticipated risk." The value of plaintiff's contract has already been ruled upon by Judge Herlands, who stated:

"Defendants have argued that the contract had no intrinsic value for the asserted reasons that 'the prices were unattractive, and any such company contemplating buying the alleged contract would have known that it was buying a lawsuit by AIOC [British Petroleum] over the title to the oil. * * *'

"This argument is without force because (1) it raises issues of fact on this summary judgment motion; and (2) its thrust is not on the question whether plaintiff had 'property' but on the question of the amount of damage, if any, sustained by plaintiff." Decision, at 87.

The proper interpretation of this passage is as the disallowance of a challenge to the profitability of the contract. It is not apparent whether the effect of anticipated risks upon the value of the contract was evaluated. Even if it had been, the risk asserted in defendants' 1970 motion differs from that argued to Judge Herlands; the existence of a cloud upon title must be distinguished from the possibility of rejection of contractual validity.

In this regard,

"The value of property, as has been so often said, is the opinion of people as to what it will fetch in exchange; and in the case of a future promise that opinion is necessarily based upon the likelihood that the promise will be performed."

Bonynge v. Helvering, 117 F.2d 157, 158 (2d Cir. 1941).

Also,

"Value is usually set by the desire to have the 'thing' and depends upon the individual and the circumstances."

United States v. Roth, 333 F.2d 450, 453 (2d Cir. 1964), cert. den., 380 U.S. 942, 85 S.Ct. 1020, 13 L.Ed.2d 961 (1965).

The proper function of this court in these circumstances should be to evaluate the "opinion of people as to what [the contract] will fetch," or "their desire to have [Iranian oil or the contract]." That opinion or desire, in turn, might well be based upon public evaluation of risks, such as the "likelihood that the promise will not be performed," which if relevant would present factual issues. But issues such as the likelihood of nonperformance or the peculiarities of individuals dealt with by plaintiff are relevant to this case only in the proof of damages as was noted by Judge Herlands. For "business or property" purposes, the question, which may or may not involve a controverted issue of fact, is the nature of the risk factors affecting the value of plaintiff's "property."

The "relevant market" for plaintiff's contract was the business community whose representatives he approached in his efforts to implement, assign, or sell it outright.[20a] At the time plaintiff

20a. No opinion is expressed as to the nature of the "relevant market" in this case for purposes other than the present motions. *See* United States v. E. I. Du Pont & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

was involved in these attempts, defendant British Petroleum Corp. had publicly advertised its intention to bring suit to try title with any purchasers of oil. Therefore, in connection with the investigation of any transaction of the size of those suggested by plaintiff to various parties, and particularly with litigation in prospect, the legal status both of the Iranians and of the plaintiff as a purchaser from them would have to bear careful scrutiny. Such scrutiny would have to include evaluation of legal safeguards against default by Iran, by plaintiff, or by an assignee of plaintiff in connection with their performance of obligations under the contract. This in turn would involve ascertainment of the content of the law which would govern possible lawsuits to be brought on the contract.

This contract was one entered into in Iran between an American and essentially the Iranian government. The oil sold was "f. o. b. Adaban (Iran)." The various conditions which plaintiff was required to effectuate, such as the arrival of two tankers in Iranian waters, were all drafted from the Iranian point of view. The conclusion seems inescapable that the "center of gravity" of this contract, if such it was, lay in Iran. *See* Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99.

If reference was necessary to any law in connection with estimation of the value of the contract, such reference would therefore have had to include examination of Iranian law. For that matter, the prudent purchaser of or under a contract involving the quantity of oil envisaged by plaintiff, would probably have investigated potential pitfalls existing under any system of law which could be considered to govern construction of the contract. In this regard, it appears that the First National Oil Company of Long Island expressed ob-

jections to the terms of the contract as one reason why it declined to do business with or through plaintiff.[21]

Defendants argue that, as a matter of law, an "unenforcible option" cannot constitute property, citing Martin v. Phillips Petroleum Co., 365 F.2d 629 (5th Cir. 1966), cert. den., 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966), reh. den., 386 U.S. 930, 87 S.Ct. 851, 17 L.Ed.2d 804 (1966), for this proposition. However, that case involved a routine suboption whose weaknesses were patent to the parties. Also, one of the defendants therein was a party to the contract, and therefore possessed of both the standing and the interest to attack the validity of the contract therein asserted.[22] In any event, standing to attack the contract was apparently neither challenged by plaintiff nor considered by the court. The case is therefore not determinative of the point.

In summary, then, the record appears unclear both as to the nature of the examination of the value of plaintiff's contract conducted by those he sought to deal with, and as to their conclusions after having conducted the examination. Plaintiff argues that defendants' alleged activities in violation of the anti-trust laws evidence their opinion that the contract was valuable, but such is not necessarily the case. They may have been merely "hedging their bets." On this record, it cannot even be said whether a fact issue exists. Such is more properly a question to be determined upon the decision of the merits of defendants' 1970 motion.

II

TEXACO'S MOTION

Defendant Texaco, Inc., has submitted affidavits, dated in 1962, from two of its corporate officers, which recount its contacts with plaintiff and his

21. The nature of its objections is not apparent on the present record.

22. The opinion in that case does not disclose whether the defendant who was a party to the contract was the appellant or one of the moving appellants.

associates. On the basis of these affidavits, depositions previously conducted by defendants, and the rest of the record, defendant concludes that it had even less contact with plaintiff than had defendant Cities Service, Inc., as to which this action has been dismissed, and therefore, *a fortiori*, that it is equally entitled to dismissal. Texaco also asserts that the only basis for its inclusion in this action is plaintiff's unsuccessful attempt to sell it oil.

In support of the timeliness of its motion, Texaco notes that Cities Service's motion was pending as early as 1960, that discovery was subsequently ordered in connection therewith, and that the motion was not finally determined until the Supreme Court's ruling of May 20, 1968.[23] Notice of Texaco's motion was first given orally on September 3, 1968, at which time defendant claims permission was granted by Judge Herlands to make the motion "with all deliberate speed," as soon as an amended complaint was filed.[24] The amended complaint subsequently filed proved unacceptable and a further amendment was ordered by this court on November 18, 1969.

■ As in the case of defendants' 1970 motion, the above is not a complete excuse for the tardiness of this motion, but it is sufficient to prevent estoppel or denial at this time. For now, the court only notes that there was no apparent reason why two "conventional" motions for summary judgment could not have been brought on at the same time in 1960; two summary judgment motions were pending in 1964, and have been from 1970 to the present. Furthermore, Judge Herlands' comment noted above is equally susceptible of the construction that Texaco was being allowed to make its motion, subject to a cross-motion to strike similar to that now pending. Nevertheless, there has

as yet been no consideration by any court of the issues raised by Texaco's motion, as there has, in a sense, been of defendants' 1970 motion. Texaco is therefore entitled to be heard.

■ Plaintiff has both opposed this motion on the merits, and also attacked it as premature in the absence of any pre-trial discovery by plaintiff of any of the defendants now in the case. This court is sympathetic to the latter argument, as Judge Herlands was when it was raised before him in connection with Cities Service's motion. It will be recalled that Judge Herlands postponed determination of that motion for approximately one year, pending discovery by plaintiff, before he eventually granted the motion.

Accordingly, Texaco's motion, being "premature" in the absence of discovery by plaintiff, will be adjourned pending discovery. Such discovery will be limited, as was plaintiff's discovery of Cities Service, in the interest of avoidance of even greater delays and expense. The precise limits will be determined after a subsequent hearing.

### III

### CONCLUSION

In accordance with the court's expressed views, *supra*, the following is ordered:

Decision of plaintiff's cross-motion is reserved pending a hearing to be held on a date to be fixed, or as soon thereafter as is convenient to counsel. Plaintiff is granted an adjournment to that date for the purpose of obtaining information relative to the content of relevant Iranian law. Consideration of the necessity for a pre-trial order requiring defendants to answer or object to plaintiff's interrogatories is deferred pending consideration of other issues hereinafter enumerated.

---

23. 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569. Petition for rehearing was denied by the Supreme Court on October 14, 1968. 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188.

24. Transcript of hearing, at 39.

At the hearing to be held under procedures envisaged by F.R.Civ.P. 42 and 44.1, the contents of Iranian law will be established, and defendants' 1970 motion will be heard on the merits. Subsequent thereto, unresolved issues of standing will be determined, and defendants' 1970 motion will be either stricken, denied, granted, or held pending subject to trial of issues of fact, if such there be, and if a separate trial is determined to be advisable.

In this connection, the court notes that separate trials have proven useful in connection with other "preliminary fact issues" in civil anti-trust cases. See e. g., Burnham Chemical Co. v. Borax Consolidated, 170 F.2d 569, 572–573 (9th Cir. 1948), cert. den., 336 U.S. 924, 69 S.Ct. 655, 93 L.Ed. 1086 (1949), reh. den., 336 U.S. 955, 69 S.Ct. 878, 93 L.Ed. 1109 (1949), and Banana Distributors, Inc. v. United Fruit Co., 158 F.Supp. 153, 160, 161–162 (1957), 162 F.Supp. 32 (1958) (S.D.N.Y., Levet, J.), rev'd on other grounds and remanded, 269 F.2d 790 (1959).

Texaco's motion is adjourned pending resolution both of defendants' 1970 motion and of plaintiff's cross-motion for a pre-trial order. A schedule for discovery required for plaintiff to be able to answer the merits of Texaco's motion will also be determined after the prospective hearing.

The court also notes, in this regard, that the determination of two "conventional" motions for summary judgment (Judge Herlands' term), by two of the original defendants, has taken over a decade without final resolution. The remaining defendants are cautioned that, should further similar motions be contemplated, notice should immediately be given. Further summary judgment motions heard seriatim would unnecessarily prolong the case. Should defendants' 1970 motion be denied, the better procedure would be, first, for any other motions to be raised, next, plain-

tiff's procedural objections, if any, heard, and then, if necessary, all remaining motions, including Texaco's to be heard on the merits.[25]

The court recognizes that this disposition does not finally resolve any of the issues presented to it. But such is the nature of this complex litigation, when counsel require court supervision of procedural matters.

So ordered.

### CHRONOLOGY OF JUDICIAL PROCEEDINGS

*June 11, 1956:* Action commenced.

*June 1956, and later dates:*

Supervision of discovery, and the setting of dates for answers or motions, by the following judges (in chronological order): Levet, Weinfeld, Walsh, Bicks, Murphy, Herlands, Edelstein, Sugarman (motion was withdrawn), Kaufman, Ryan, Ch. J. (who assigned the case to Judge Herlands for all purposes), Palmieri, MacMahon, and Cooper.

*March 18, 1957:*

Motion of defendant Standard Oil of California to dismiss for improper venue and to vacate service denied. Dawson, J., 149 F.Supp. 830 (S.D.N.Y.1957).

*April 8, 1960:*

Motion by defendant Cities Service for summary judgment and dismissal.

*March 30, 1961, and later dates:*

Motion adjourned; supervision of pre-trial discovery continued. Herlands, J.

*July 12, 1963*

(first) Amended Complaint.

*June 23, 1964:*

Omnibus motion by all defendants other than Cities Service for summary judgment and dismissal (lack of "business or property" under the Clayton Act, § 4, 15 U.S.C. § 15, conduct violative of public policy,

**25.** It should be made explicit that the court in no way encourages additional motion practice in this case.

etc.) denied. Cities Service's motion adjourned pending limited discovery by plaintiff. Herlands, J. 231 F. Supp. 72 (S.D.N.Y.1964).

*September 8, 1965:*

Action dismissed as against defendant Cities Service.

Herlands, J. 38 F.R.D. 170 (S.D. N.Y.1965).

*February 5, 1966:*

Mrs. Patricia Waldron, executrix, substituted as plaintiff for her husband (deceased as of November 1964).

*June 6, 1966:*

Judgment of dismissal affirmed.

Before Judges Waterman, Feinberg, and Anderson; opinion by Anderson, J. 361 F.2d 671 (2d Cir. 1966).

*January 16, 1967:*

Certiorari granted. 385 U.S. 1024, 87 S.Ct. 743, 17 L.Ed.2d 672.

*April 24, 1967:*

Ruling on bearing the costs of printing an additional record.

386 U.S. 1015, 87 S.Ct. 1367, 18 L.Ed.2d 453.

*May 20, 1968:*

Motion to substitute First National Bank of Arizona, successor executor, for deceased executrix, for purpose of appeal, granted.

391 U.S. 911, 88 S.Ct. 1800, 20 L. Ed.2d 650.

*May 20, 1968:*

Judgment of dismissal affirmed, by vote of 5 to 3. Opinion by Justice Marshall. Dissent by Justice Black, concurred in by Justices Warren and Brennan. Mr. Justice Douglas took no part.

391 U.S. 253, 88 S.Ct. 1575, 20 L. Ed.2d 569.

*October 14, 1968:*

Petition for rehearing denied.

393 U.S. 901, 89 S.Ct. 63, 21 L.Ed. 2d 188.

*May 10, 1969:*

Successor executor substituted in main action.

*November 18, 1969:*

Second amended complaint disapproved; third amended complaint allowed; time for defendants' answers and motions set.

Croake, J. (under Rule 2 assignment, after death of Herlands, J.)